Adam Brook, M.D., Ph.D.
813 Delmar Way Apt 306
Delray Beach, FL  33483
(415) 516-0787
brook1231@gmail.com

Plaintiff *pro se*

Daniel William Isaacs, Esq.
Law Offices of Daniel W. Isaacs, P.L.L.C.
122 Cross River Rd
Mount Kisco, NY  10549-4034
(646) 438-2100
daniel.isaacs@danwisaacsesq.com

Attorney for Plaintiff
Estate of Judith Brook

united states district court
for the southern district of new york

| | |
|---|---|
| **Estate of Judith Brook, and Adam Brook,** | Case No. |
| Plaintiffs; | |
| | _____ |
| *v.* | |
| | **Complaint and demand for jury trial** |
| **Monitor/Me LLC, The Mary Manning Walsh Nursing Home Company, Inc., Jason Kubert, M.D., Eric Nowakowski, R.P.A.-C, Anthony Bacchi, M.D. and John Does #1-10,** | |
| Defendants. | |

1. Plaintiff Estate of Dr. Judith Brook, by and through its attorney, and plaintiff *pro se* Adam Brook, M.D., Ph.D., both personally, as next of kin of, and as a personal representative of the Estate of, Judith Brook, allege the following:

**nature of the action**

2. That the Decedent, Judith S. Brook, died on March 15, 2020, while a resident of the County of New York, State of New York, and thereafter on the 17th day of February 2021, Letters Testamentary were issued appointing the plaintiff, Adam M. Brook, as Co-Executor by the Surrogate's Court of the State of New York, County of New York, and plaintiff duly qualified and thereafter acted and still is acting in the capacity of co-executor.

3. This federal action arises under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §1983 and §1988, the New York State Constitution, and for state common law claims under supplemental jurisdiction.

4. This action seeks damages, attorneys' fees and costs. The claims encompass defendant The Mary Manning Walsh Nursing Home Company, Inc.'s ("Mary Manning's") and its employees' conspiracy as a willful participants in joint action with New York State actors, including Judith's state court-appointed guardian, Joseph Ruotolo ("Ruotolo"), for a common purpose, to force the late Dr. Judith Brook into Mary Manning

1

Walsh Nursing Home against her will, and to keep Judith there against her will, under color of state law, for the common financial benefit of Ruotolo and the Defendants. These actions thereby deprived Judith of her right to life, liberty and property, and caused her premature death on March 15, 2020, in violation of the Fourth, Fifth, and Fourteenth Amendments of the Constitution, and by the unconstitutional application of a state law that provides statutorily limited powers to a guardian for a person found by a state court to be "incapacitated".

5. This action is related to a co-pending action in this Court filed on July 20, 2022, entitled *Adam Brook v. Joseph Ruotolo, et al*., 22 Civ. 06173, which asserts claims under §1983 and the aforesaid and other constitutional claims, as well as certain common law claims under supplemental jurisdiction (hereinafter the "*Brook v. Ruotolo* Action.") That Action alleges a conspiracy by the state Guardianship Court and the defendants in that Action to find Judith Brook an incapacitated person in order to appoint a guardian over her person and property for the common purpose of the co-conspirators to enable the Guardianship Court to use Judith's substantial assets to pay all those defendant participants in their respective roles as petitioner, appointed court evaluators, appointed counsel for the incapacitated person, court-appointed guardian Ruotolo, and their respective attorneys, for their financial benefit, in the form of state court-approved legal fees and compensation.

6. This action names additional defendants discovered after filing the *Brook v. Ruotolo Action*, and adds new claims related to the defendants herein.

2

7.  The aforesaid guardianship proceeding was filed May 9, 2019, by Judith's
    brother, Howard Muser, who was dissatisfied with what he believed
    Judith's Will and estate plan provided. Mr. Muser's petition was filed in
    New York State Supreme Court under Index No. 500123/2019 to declare
    Judith an incapacitated person, and to request that Muser be appointed
    sole guardian over Judith's person and property. This action arises out of
    the same guardianship proceeding and the conduct of Joseph Ruotolo,
    appointed at the outset by the Guardianship Court, to act as temporary
    guardian of Judith's person and property. Specifically, by a January 3,
    2020-Order of the New York State Supreme Court ("the January 3-Order")
    the powers of guardian Ruotolo were broadly expanded, and the Court
    revoked the prior power-of-attorney and healthcare-proxy that Judith had
    given to her son Adam Brook. Shortly thereafter, on January 17, 2020,
    Ruotolo, in conspiracy with defendant Mary Manning, promptly dumped
    Judith in the Mary Manning Walsh Nursing Home against her will. In
    doing so, Ruotolo exceeded his authority as guardian, and Mary Manning
    conspired with Ruotolo to allow Ruotolo to exceed his authority for their
    mutual financial benefit.

8.  Promptly after Ruotolo delivered Judith against her will to Mary Manning,
    Judith's medical condition rapidly worsened in the nursing-home as a
    result of the medical malpractice and tortious conduct of all defendants.
    In just 4 days after January 17, 2020, Judith exsanguinated to the point of
    unconsciousness, underwent CPR, and was transferred by ambulance to
    New York Presbyterian Hospital ("NYP"). She never recovered and died on

March 15, 2020, in the NYP Intensive Care Unit. The actions of defendants and others thus resulted in Judith's premature death on March 15, 2020, only 58 days after Ruotolo and Mary Manning forced Judith against her will into the nursing-home.

9. The common law claims in this action include wrongful death, medical malpractice, breach of fiduciary duty, negligence, negligent supervision, negligent selection, and negligent retention as more fully alleged herein.

10. As an alternative theory of liability, defendants Mary Manning Walsh Nursing Home, Monitor/Me, L.L.C., and Anthony Bacchi, M.D. are vicariously liable for the negligent and wrongful acts of their employees and contractors which proximately caused Judith's premature demise.

11. This Complaint, arising from these tragic, outrageous, and unlawful acts, seeks compensatory and punitive damages, costs, disbursements, and attorneys' fees pursuant to 42 U.S.C. §1983 for the Constitutional violations and applicable state law claims.

**The conspiracy between Ruotolo and Mary Manning to force, and keep, Judith in the nursing-home against her will**

12. For years before the guardianship proceeding and continuing for approximately 7 months after Ruotolo first received his temporary guardianship powers from the state court, without a hearing, Judith was living in her long-time family residence at 350 Central Park West, New York, NY with the care of her sole surviving son, plaintiff herein, Adam Brook M.D., Ph.D. ("Dr. Brook"). At all times relevant, Dr. Adam Brook was

a New York-licensed physician and surgeon and was Board-certified cardiothoracic surgery. Dr. Brook lived with his mother Judith in the same apartment and well managed her medical care. After Judith suffered a spontaneous spinal fracture, she admitted to NYU Medical Center and then subsequently to a rehabilitation facility. During this time, her brother Muser commenced the above referenced guardianship proceeding on May 9, 2019.

13. While the guardianship proceeding was pending and Ruotolo initially appointed, Judith returned to her home and was provided with round the clock nurses or home health aides.

14. On December 24, 2019, Judith was admitted to NYP for treatment of a urinary tract infection. She was discharged home on January 2, 2020. Therefore, she did not feel well enough to attend a January 3, 2020-hearing in the Guardianship Court on Muser's petition to have a guardian appointed. The Guardianship Court refused a requested adjournment of that hearing and proceeded in Judith's absence. At the end of the hearing, the Court entered the January 3-Order described above, expanding Ruotolo's powers and revoking Adam's appointments and proxy.

15. Judith was hospitalized on January 12, 2020, with a urinary tract infection. On January 17, 2020, Ruotolo told NYP staff that he was Judith's court-appointed guardian, and, further, Ruotolo directed NYP staff to transfer Judith to the Mary Manning Walsh Nursing Home against her will.

16. Under New York Mental Hygiene Law §81.22 (a)(9) and 81.36, the powers of a court-appointed guardian are limited, and do not include the right to place, or maintain, a ward in a nursing-home against her will. Placing an incapacitated person in a nursing-home requires a hearing on notice to the incapacitated person with the incapacitated person's participation. No such hearing occurred or was even sought. The January 3-Order expanding Ruotolo's powers as guardian did not grant Ruotolo authority to place Judith in a nursing-home against her will.

17. Court-appointed guardian Ruotolo, in conspiracy with Mary Manning, by forcing Judith into the nursing-home, and forcing Judith to stay in the nursing-home, acting under the January 3-Order and otherwise as court-appointed Guardian, under color of state law, exceeded the authority granted to him by the Guardianship Court and deprived Judith of her liberty and ultimately of her life, without due process, in violation of §1983 and her rights under the U.S. Constitution and the New York State Constitution.

18. Ruotolo could not have accomplished his illegal forcing Judith into the nursing-home, and his illegal forcing Judith to stay in the nursing-home, without the cooperation and conspiracy of the Mary Manning Walsh Nursing Home. Staff at Mary Manning Walsh Nursing Home, licensed under state law to provide nursing-home care, knew, should have known, and were legally required to know pursuant to the New York State Nursing Home Resident Bill of Rights, that "incapacitated" persons cannot

6

be forced into, and forced to remain in, a nursing-home without a specific court order directing such placement.

19. Mary Manning Walsh Nursing Home is liable under 42 U.S.C. §1983 because Mary Manning Walsh Nursing Home conspired with Ruotolo, a state actor, to unlawfully force Judith into the nursing-home and keep her there against her will for their mutual financial benefit. Upon information and belief, Mary Manning Walsh billed for and was paid for the time and all services purportedly rendered to Judith Brook, despite the gross inadequacy of such care as hereinafter alleged.

20. As is documented in Mary Manning Walsh Nursing Home's medical records, between January 17 and January 21, 2020, Judith repeatedly and expressly told Mary Manning Walsh Nursing Home nurses and other staff that she wanted to be discharged home immediately. Guardian Ruotolo's claim for "services rendered" confirms he was informed of Judith's wishes to return home, but he and Mary Manning refused to follow those wishes.

> **Commented [TW1]:** Check his time sheets for this; or allege who told Ruotolo this – by Adam, by Nicole, by Howard, by friend Liz Rubenstone, etc.

21. Mary Manning Walsh Nursing Home staff knew, or should have known, that, absent a specific court order, there is no legal authority for a nursing-home to decide to keep a patient in the nursing-home when the patient requests to leave.

22. Between January 17 and January 21, 2020, Judith repeatedly requested of nursing-home staff that she be discharged from the nursing-home to her own home.

23. Nursing-home staff ignored Judith's increasingly desperate requests.

7

24. Nursing-home staff also ignored pleas from Judith's relatives and friends that she be discharged from the nursing-home and permitted to return home.

**The Monitor/Me defendants and Mary Manning Walsh Nursing Home committed serious medical malpractice, resulting in Judith's premature and wrongful death**

25. As detailed herein, defendants Monitor/Me, L.L.C., Anthony Bacchi, M.D., Jason Kubert, M.D., and Eric Nowakowski, P.A.-C. ("the Monitor/Me defendants") and Mary Manning Walsh Nursing Home committed serious malpractice in their treatment of Judith.

26. Mary Manning staff forced Judith to lie in her stool 24 hours-a-day and did not give her any of her medications. When, as a result of the stressful conditions she was subjected to and the failure to give Judith her medications, Judith developed gastrointestinal bleeding, Mary Manning Walsh Nursing Home staff and the Monitor/Me defendants—who were providing telemedicine services to Mary Manning Walsh Nursing Home— deviated from the standard of care by not transferring Judith immediately to a hospital for resuscitation and evaluation by a gastroenterologist.

27. Instead, Mary Manning Walsh Nursing Home staff and the Monitor/Me defendants let Judith bleed from her gastrointestinal tract until she passed out.

28. CPR was initiated, causing a rib fracture leading to pneumonia and Judith's premature death 58 days later.

8

**Parties**

29. Dr. Judith Brook was an acclaimed researcher and professor of psychiatry at such institutions as New York University School of Medicine, Mount Sinai Medical Center, and Columbia University. She had a distinguished reputation, publishing over 357 research articles, securing millions of dollars in research grants from the National Institute of Health as well as other institutions. Judith frequently traveled the world to present her research findings to her peers.

30. As hereinabove alleged, on May 9, 2019, Judith Brook's brother Howard Muser filed a petition to have his sister Judith Brook declared an "incapacitated person". Muser's petition requested that Muser himself be appointed Judith's guardian with control over her person and property.

31. Judith and her son Adam, plaintiff herein and represented in that case by his own retained counsel, vigorously opposed the petition. When the Guardianship Court expanded the appointment of Ruotolo in Judith's absence by the January 3, 2020-Order, Judith and her son Adam sought to appeal that decision.

32. As described herein, Ruotolo then forced Judith into the Mary Manning Nursing-Home on January 17, 2020.

33. At the time of her death, on March 15, 2020, Judith was a citizen of the United States and a citizen and resident of New York.

34. Plaintiff Adam Brook, M.D., Ph.D. is Judith's sole surviving child and a personal representative of Judith's estate.

9

35. Dr. Brook is a citizen and resident of the state of Florida, with a legal residence and domicile in Delray Beach, Florida.

36. For many years prior to the events commencing in May 2019, Dr. Brook held Judith's power-of-attorney and healthcare-proxy, which Judith had executed 13 years earlier. By the Guardianship Court's January 3, 2020-Order, that power-of-attorney and healthcare-proxy was improvidently voided by the Guardianship Court acting in conspiracy with the defendants in the *Brook v. Ruotolo* Action. The consequences of the January 3-Order were disastrous for Judith.

37. As hereinabove alleged, in 2019, Dr. Brook lived with Judith in Judith's apartment on Central Park West in Manhattan, New York City, and well cared for her personal and medical needs.

38. Defendant The Mary Manning Walsh Nursing Home, Inc. was and is a New York State corporation duly existing under and by virtue of the laws of the State of New York, having its principal place of business at 1339 York Ave. at 72nd St., New York, NY  10021. The Mary Manning Walsh Nursing Home, Inc. is therefore a citizen of New York.

39. At all times relevant hereto defendant Mary Manning was authorized to do business as a nursing home.

40. Mary Manning was the nursing-home into which Ruotolo forced Judith shortly after Ruotolo obtained expanded powers over Judith's person by the state court's order of January 3, 2020.

41. At all times relevant hereto defendant Mary Manning Walsh Nursing Home was responsible for the appointment, training, supervision and

conduct of all Mary Manning personnel, including Mary Manning's employees and contractors. In addition, Mary Manning was responsible for enforcing Mary Manning's policies and procedures and for ensuring that Mary Manning personnel obey the laws of the United States, the laws of the State of New York, and all New York State rules and regulations.

42. Defendant Eric Nowakowski, R.P.A-C. was and is a physician assistant duly licensed to practice as a physician assistant in the New York State. Upon information and belief, Nowakowski is a citizen and resident of New York. Nowakowski was employed by defendant Monitor/Me, L.L.C. to provide telemedicine and medical coverage services for Mary Manning Walsh Nursing Home.

43. Defendant Monitor/Me, L.L.C. ("Monitor/Me") is a New York limited liability company that provides telemedicine and other services to New York nursing homes. Monitor/Me, L.L.C. provided telemedicine services for Mary Manning. Monitor/Me, L.L.C. employed defendants Eric Nowakowski and Dr. Jason Kubert to provide telemedicine and other services for Mary Manning.

44. Defendant Anthony Bacchi, M.D. is a physician duly licensed to practice medicine in New York. Upon information and belief, Dr. Bacchi is a citizen of New York. Dr. Bacchi is the *alter ego* of Monitor/Me, L.L.C. Dr. Bacchi dominated and had direct control over Monitor/Me, which, upon information and belief, is a corporate shell, with minimal assets, fraudulently created by defendant Dr. Bacchi, for the purpose of

11

wrongfully escaping liability for medical malpractice and other tortious conduct. Dr. Bacchi, hiding behind the corporate veil of Monitor/Me, L.L.C., and, upon information and belief, operating Monitor/Me, L.L.C. without maintaining proper corporate formalities, inequitably seeks to avoid liability for the acts of medical malpractice and other torts committed by Monitor/Me, L.L.C.

45. Defendant Jason Kubert, M.D. is a physician duly licensed to practice medicine in New York. Upon information and belief, Dr. Kubert is a citizen of New Jersey. Monitor/Me, L.L.C. employed Dr. Kubert to supervise defendant Nowakowski and to provide telemedicine and other services for Mary Manning Walsh Nursing Home.

46. At all times relevant hereto, defendants John Does #1–10, whose actual names plaintiffs have been unable to ascertain notwithstanding reasonable efforts to do so, but who are sued herein by the fictitious designation "John Doe", were personnel of Mary Manning Walsh Nursing Home and Monitor/Me, L.L.C., acting in the capacity of agents, servants, and employees of defendants Mary Manning Walsh Nursing Home and Monitor/Me, L.L.C., and within the scope of their employment as such, and involved with the healthcare and medical treatment of the late Judith Brook.

**Jurisdiction and venue**

47. This action arises under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and state common law.

12

48. This Court has subject matter jurisdiction over the federal and Constitutional claims in this Complaint pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343(a)(3) and (4) (federal questions).

49. This Court has supplemental jurisdiction over the claims in this Complaint that arise under the common law, statutes, and Constitution of the State of New York pursuant to 28 U.S.C. §1367, because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

50. Venue is appropriate in this District pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

**Factual allegations**

51. On January 3, 2020, the Guardianship Court voided the healthcare-proxy and power-of-attorney that Dr. Adam Brook held for his mother for years. Finding that Judith Brook is "an incapacitated person in need of an Article 81 guardian", the Guardianship Court "vacat[ed]" Dr. Adam Brook's power-of-attorney and healthcare-proxy, and expanded Ruotolo's temporary powers to include being temporary guardian of the person and property of Dr. Judith Brook with expanded powers.

**After Ruotolo's appointment as Judith's guardian, Ruotolo; Mary Manning Walsh Nursing Home; Mary Manning Walsh Nursing Home employees and**

13

**contractors; Monitor/Me, L.L.C.; Monitor/Me, L.L.C.'s employees; and others wrongfully caused Judith's death.**

52. After his appointment as temporary guardian of Judith's person and property, Ruotolo breached his fiduciary duties to Judith and, in concert with defendants herein, committed a series of actions and omissions that proximately caused Judith's wrongful death and breached his fiduciary duties to Judith.

53. On January 12, 2020, Judith became ill and needed to be taken from her residence by ambulance to New York Presbyterian Hospital.

54. Ruotolo had selected the Allegiant Home Care agency ("Allegiant") to provide nursing services, including medication administration, for Judith. 10 NYCRR §763.7 required Allegiant Home Care, a homecare-agency, to make and preserve medical records.

55. On June 16, 2020, responding to its legal requirement to provide medical records to Dr. Adam Brook in response to his demand for his deceased mother's medical records, Allegiant produced Judith's medical records in their possession, including medical records Allegiant created.

56. Notably missing were Allegiant medical records from January 2020, including medication administration records for the period January 3– January 12, 2020, even though 10 NYCRR §763.7(c) required that "[e]ach patient's clinical records shall be kept securely for not less than six years after discharge from the agency[.]"

57. Upon information and belief, on January 12, 2020, Judith became ill because Allegiant Home Care nurses failed to administer medications properly to Judith.

58. The Allegiant nurse who administered medications to Judith, on January 12, 2020, was only "moonlighting" as a nurse. His day job was as a firefighter.

59. Judith was hospitalized at NYP on January 12, 2020. Judith recovered and was discharged on January 17, 2020.

60. On January 17, 2020, Ruotolo conspired with Mary Manning Walsh Nursing Home to direct that Judith not be permitted to return to her home at 350 Central Park West.

61. Ruotolo and Mary Manning Walsh Nursing Home staff conspired to order that Judith be sent to the Mary Manning Walsh Nursing Home against her will.

62. Ruotolo and Mary Manning Walsh Nursing Home staff conspiring to place Judith in Mary Manning Walsh Nursing Home and forcing Judith to remain in Mary Manning Walsh Nursing Home violated NYMHL §81.22(a)(9), since Ruotolo had no court order to place Judith in a nursing-home against her will or to change her residence.

63. Mary Manning Walsh Nursing Home staff told Dr. Adam Brook on repeated occasions that they were not permitted to provide him with any information about his mother's medical condition or care because his mother's court-appointed guardian, Ruotolo, had given them instructions not to provide any information about his mother's medical care.

64. Mary Manning Walsh Nursing Home staff further told Dr. Adam Brook

that they were not permitted to discuss Judith's medical condition or care

with him because Judith's court-appointed guardian had given them

instructions not to discuss Judith's medical condition or care with him.

Mary Manning Walsh Nursing Home staff told Dr. Adam Brook this even

though the January 3, 2020-Order provided by its terms that Dr. Adam

Brook be allowed to participate in his mother's medical care.

65. Mary Manning Walsh Nursing Home medical records, produced June 5,

2020, page 112, which is the January 17, 2020-3:57 PM New York

Presbyterian Hospital "Discharge-Reconciliation" document, provides:

"metoprolol tartrate 25 mg oral tablet *1 tab(s)* orally every 12 hours"

crossed out; "metoprolol tartrate oral tablet 25 mg oral tablet *0.5 tabs*

[*i.e.*, 12.5 mg] orally every 12 hours–Indication: Heart Disease"; and

"Discontinued; Copy/Discontinue" followed by "metoprolol tartrate 25

mg oral tablet is continued and modified". (Page 113. Emphasis added.)

66. However, Mary Manning medical records page 111, the January 17 4:08

PM New York Presbyterian Hospital "DISCHARGE MEDICATION LIST",

provides, under the heading "Stop taking these medications listed below",

"metoprolol tartrate 25 mg oral tablet". (Page 112)

67. Thus, the New York Presbyterian Hospital discharge medication

reconciliation, which indicates that the dose of metoprolol is to be

lowered but not discontinued, is inconsistent with the New York

Presbyterian Hospital discharge medication list, which indicates that

metoprolol is to be discontinued.

68. Rather than contact New York Presbyterian Hospital physicians to learn whether Judith should be administered 12.5 mg of metoprolol tartrate or whether Judith should not be administered metoprolol tartrate, Mary Manning physicians simply and without explanation did not order metoprolol for Judith during her stay at Mary Manning Walsh Nursing Home that began January 17, 2020. This is documented in pages 202 to 206 of Mary Manning Walsh Nursing Home medical records ("Med Rec. P 201-205").

69. Metoprolol, which Judith's physicians prescribed in order to prevent tachycardia and inadequate diastolic filling time as Judith had left ventricular outflow tract obstruction, was a critical medication for Judith to receive.

70. But for Ruotolo acting as temporary guardian telling Mary Manning Walsh Nursing Home staff not to discuss Judith's medical care with Dr. Adam Brook, and but for Mary Manning staff agreeing not to discuss Judith's medical care with Dr. Adam Brook notwithstanding that Dr. Adam Brook told Mary Manning staff that court orders directed that Dr. Adam Brook be permitted to participate in his mother's medical care, Dr. Adam Brook would have learned about the error that his mother was not receiving metoprolol, and would have explained the importance of metoprolol for his mother to Mary Manning staff, including Mary Manning physicians and nurses.

71. At Mary Manning Walsh Nursing Home, Judith was not permitted to walk to the bathroom, but was forced to lie for hours in her own stool. This

was witnessed by Dr. Adam Brook while visiting Judith at Mary Manning and is documented in Page 3 of Dr. Adam Brook January 20, 2020-email to Ruotolo.

72. On January 19, 2020, Dr. Adam Brook emailed Ruotolo that his mother was not receiving proper medication and that "my mother could have a major bleeding episode". (Page 1)

73. Judith and her friend Liz Rubenstone repeatedly telephoned Ruotolo and begged him to discharge Judith home or to at least address the horrific conditions at Mary Manning Walsh Nursing Home. Ruotolo refused. Judith repeatedly begged Mary Manning Walsh Nursing Home staff to send her home, but Mary Manning staff refused to do so.

74. Being forced to lie in her stool for hours caused 80-year-old Judith significant stress. Mary Manning Walsh Nursing Home January 19, 2020-Nursing-Progress-notes document as follows:

> Resident is shouting at the staff and refusing care including VS [having her vital signs measured]. She is saying "she wants to go home." (Mary Manning Med Rec. P 229)

75. As a result of the horrific conditions Judith was subjected to, Judith was upset, confused, and refused her medications repeatedly. (Mary Manning Med Rec. P 8–10)

76. No one at Mary Manning notified Dr. Adam Brook that his mother was refusing to take her medications.

18

77. As documented by Mary Manning medical records pages 8–10, even
    though Judith had been judicially declared "incapacitated" (January 3,
    2020-Order), when Judith refused to take her medications, nursing-home
    staff repeatedly simply did not give Judith her medications, including
    cardiac medications and pantoprazole, which Judith's physicians had
    prescribed for her in order to prevent gastrointestinal bleeding.

78. Ruotolo ignored Dr. Adam Brook's emails to him complaining about the
    horrific conditions which Dr. Adam Brook personally observed his mother
    was subject to at Mary Manning, including that his mother was "lying in
    her feces", that Mary Manning staff were not permitting his mother to
    walk to the bathroom with assistance, and that his mother was saying "I
    need help, I am dying here". Dr. Brook's email to Ruotolo told Ruotolo:
    "[M]y mother could have a major bleeding episode".

79. Those responsible for Judith's welfare failed to discharge their duties
    satisfactorily by failing to ensure Judith received her medications,
    particularly where, as here, they were told that there were problems with
    the medication administration and told that she "needs to be evaluated
    promptly by a competent medical professional." (Dr. Adam Brook's
    January 19, 7:01 AM email to Ruotolo)

80. Dr. Adam Brook did not learn that his mother was not taking her
    medications because Ruotolo instructed Mary Manning staff not to
    discuss Judith's medical care with Adam, and Mary Manning staff
    improperly heeded Ruotolo's instruction not to discuss Judith's medical

care with Adam, notwithstanding that Mary Manning was in possession
of the January 3, 2020-Order to the contrary.

81. Medications that New York Presbyterian Hospital medical staff directed
that Judith receive after discharge, but which she did not receive at Mary
Manning Walsh Nursing Home, included midodrine and magnesium.
Mary Manning Med Rec. P 110, January 17, 2020-4:22 PM New York
Presbyterian Hospital "DISCHARGE MEDICATION LIST"; *compare* Mary
Manning Med Rec. P 8-10, Mary Manning Medication Administration
Record, "Not Administered/Not Completed", indicating midodrine and
magnesium were repeatedly not administered.

82. Midodrine raises blood pressure; therefore, if midodrine had been given,
it would have helped prevent Judith from becoming unresponsive.

83. Magnesium is critical for proper cardiac function.

84. Another medication that New York Presbyterian Hospital medical staff
directed that Judith receive after discharge, but which she did not receive
at Mary Manning, was pantoprazole. (Mary Manning Med Rec. P 8–9;
*compare* Mary Manning Rec. P 110)

85. Pantoprazole prevents gastrointestinal bleeding.

86. Stress also causes gastrointestinal bleeding.

87. It is medical malpractice for an elderly woman with a history of
gastrointestinal bleeding—who has been prescribed pantoprazole by her
gastroenterologist (Dr. Srihari Mahadev)—not to be given pantoprazole,
and for her simultaneously to be subjected to extreme stress by being

20

forced to lie in her own stool and not permitted to walk to the bathroom with assistance.

88. In failing to administer Judith her medications, Mary Manning staff deviated from the standard of care.

89. These circumstances that Judith was subjected to of not being administered pantoprazole; the stress of being forced to lie in one's own stool; the stress of being wrongfully stripped of all of one's civil and Constitutional rights, including the right to choose to go home; and the stress of the threat of being separated from one's sole surviving child foreseeably and proximately caused Judith to develop gastrointestinal bleeding.

90. That is exactly what happened. Monitor/Me, L.L.C. was contracted by Mary Manning Walsh Nursing Home to provide telemedicine services to nursing home patients including Judith. Eric Nowakowski, P.A.-C., was employed by Monitor/Me to provide telemedicine services to nursing home patients at Mary Manning, including Judith. Nowakowski's note for January 20, 2020-8:10 PM documents (Mary Manning Med Rec. P 240) that Judith had an episode of "dark/tarry stool". Dark/tarry stools are pathognomonic of gastrointestinal bleeding. Incredibly, Nowakowski and Mary Manning staff ascribed the dark/tarry stools to "[r]eports that she is on iron supplement" (Mary Manning Med Rec P. 240). But iron supplements cause dark stools, not dark/tarry stools.

91. The development of dark/tarry stools in this elderly woman with a history of gastrointestinal bleeding should have prompted immediate transfer to

21

a hospital as the standard of care. But Nowakowski and Mary Manning staff did not transfer Judith to a hospital and misdiagnosed the cause of the melena. In such misdiagnosis and then failing to transfer Judith to a hospital, Nowakowski and Mary Manning staff deviated from the standard of care.

92. Nowakowski and Mary Manning staff checked laboratory-values. Laboratory-values on blood collected January 21 12:00 AM included hemoglobin 7.2 (Med Rec. P 74) and BUN/Creatinine ratio of 45/1.06 (Med Rec. P 75). These values, a hemoglobin of 7.2, and a BUN/creatinine ratio of 42.4, are consistent with gastrointestinal bleeding.[12] Failure to recognize that these laboratory value abnormalities (low hemoglobin, high BUN/creatinine ratio), in an elderly patient with a history of hereditary hemorrhagic telangiectasia and recurrent gastrointestinal bleeding, and who was having melena, indicated that Judith was having gastrointestinal bleeding constitutes a deviation from the standard of care.

---

[1] Smith DL. Anemia in the elderly. *Am Fam Physician.* 2000 Oct 1;62(7):1565–72. PMID: 11037074.

[2] Ernst, Amy A., et al. "Usefulness of the blood urea nitrogen/creatinine ratio in gastrointestinal bleeding." *The American journal of emergency medicine* 17.1 (1999): 70–72.

93. Moreover, the hemoglobin of 7.2 (normal range for white women 13.4–
14.2[3]) indicated that Judith's hemoglobin-level was much lower than
what was needed for her heart to function properly. Judith's medical
records of her cardiologists' experiences with and treatment of Judith
were that her hemoglobin should be over 10 because of left ventricular
outflow tract obstruction.

94. If Ruotolo had not instructed Mary Manning staff not to speak to
Dr. Adam Brook about his mother's healthcare, Dr. Adam Brook would
have learned of the laboratory values of Judith's blood work and, knowing
her cardiac medical history, would have sought timely medical
intervention and treatment. Ruotolo's and defendants' violation of the
January 3-Order that Dr. Adam Brook be informed of his mother's
healthcare was also a proximate cause of her suffering the adverse events
of exsanguination, then fainting, followed by Mary Manning staff
administering CPR and causing a rib fracture, which proximately caused
Judith's premature death.

95. Moreover, the failure by Monitor/Me and Mary Manning physicians to
adequately supervise a physician assistant and nursing staff constituted a
deviation from the standard of care.

---

[3] Ganji, Vijay, Mohammad, Kafai. "Hemoglobin and hematocrit values are higher and prevalence
of anemia is lower in the post–folic acid fortification period than in the pre–folic acid fortification
period in US adults." *Am. J. clinical nutrition* 89.1 (2009): 363–371.

**Ruotolo; Mary Manning and Mary Manning's employees; and Monitor/Me and Monitor/Me's employees failed to ensure Judith received proper treatment and medical care.**

96. On January 17, 2020, Ruotolo and Mary Manning conspired to direct that Judith be placed in Mary Manning against her will and directed nursing-home staff not to discuss Judith's medical condition or care with Dr. Adam Brook. Ruotolo and Mary Manning staff ignored pleas from Judith and Judith's friend Rubenstone that Judith be returned home.

97. At Mary Manning, nursing-home staff refused to allow Judith to walk to the bathroom with assistance and forced her to lie in her own stool.

98. Mary Manning medical records, entry for January 18, 2020, 10:22 AM is an entry by Mary Manning social worker Dori Shore, in which Ms. Shore wrote: "Resident reports that she is eager to go home and is having difficulty adjusting to facility which caused her to be awake most of the night. Resident denies any issues with depression, appetite, or concentration."

99. But Ruotolo and Mary Manning forced Judith to stay in the Mary Manning Walsh Nursing Home against her will and did not let her go home.

100.     On January 19, 2020, 6:56 AM, Dr. Adam Brook emailed Ruotolo:

As you know, you volunteered to be my mother's healthcare proxy, and were so appointed by Judge Kelly O'Neill-Levy. My mother Judith Brook, who you stuck in the Mary Manning Walsh nursing home, just called me and said "I need help, I am dying here." My mother is having excruciating abdominal and back pain,

24

and it is not being treated. My mother's friend Elizabeth Rubenstone told me that the nursing staff has been giving her Tylenol. Tylenol is contraindicated for her because it is hepatotoxic i.e. it causes liver damage in her, and her bilirubin has been elevated. Given my mother's preexisting elevated bilirubin, giving my mother Tylenol carries with it a significant risk of causing her permanent liver damage. It is my expectation that you will ensure that these serious medical symptoms my mother is having are investigated, and addressed, expeditiously. Thank you in advance for your anticipated cooperation.

101.     On January 19, 2020, 7:01 AM, Dr. Adam Brook emailed Ruotolo:

I have now been told that a nurse came in and offered my mother ibuprofen.
Ibuprofen is contraindicated in my mother, who has hereditary hemorrhagic telangiectasia, because of ibuprofen's effects on hemostasis: my mother could have a major bleeding episode.
My [mother] needs to be evaluated promptly by a competent medical professional.
Thank you in advance for ensuring that will happen this morning.

102.     Ruotolo's timesheet has a January 19, 2020-entry, "Rcd [received] emails from A. Brook re IP's [incapacitated person's] medications." However, despite admitting receiving these warnings, Ruotolo failed to take any action to address Judith's worsening condition that Dr. Adam Brook had repeatedly advised Ruotolo of. Ruotolo failed to raise these concerns with Mary Manning medical staff.

103.    Mary Manning, medical records page 229, entry for January 19, 2020, 6:09 PM says: "Resident is shouting at the staff and refusing care including VS [vital signs]. She is saying 'she wants to go home.' MD notified as well as Nursing Supervisor." But there is no indication that any physician or nursing supervisor intervened or took any action to treat these worsening conditions.

104.    Instead of responding to Judith's requests to return home, Ruotolo and the Mary Manning staff forced Judith to remain in the Mary Manning Walsh Nursing Home against her will and would not let her return home. Ruotolo and Mary Manning staff did so even though they did not have any legal authority to do so. The January 3, 2020-Order expanding Ruotolo's powers as guardian did not include the power to change her residence or force Judith into a nursing-home against her will.

105.    Ruotolo's timesheet also has a January 19, 2020-entry regarding "AM TC [telephone call] from L. Rubenstone re her TC with A brook this day, staying with IP [incapacitated person] overnight & her desire for IP to return home."

106.    Ruotolo's timesheet also has a January 19, 2020-entry, "Received voice message from N. Hazard [Judith's daughter-in-law] re IP's [incapacitated person's] desire to return home."

107.    Ruotolo's timesheet also has a January 19, 2020-entry stating "Rcd [received] email from petitioner [Howard Muser] re IP's [incapacitated person's] return home."

108.    But Ruotolo and the Mary Manning staff ignored all these requests and communications and forced Judith to remain in the Mary Manning Walsh Nursing Home against her will. Judith was mistreated and did not receive ordered and medically necessary medications. This wrongful conduct constituted both medical malpractice and intentional infliction of emotional distress.

109.    Ruotolo's timesheet contains an entry for January 20, 2020, "Telephone call to Mary Manning Walsh (RN Tolentino) re IP and presence of aide and Ms. Rubenstone." By reason of Ruotolo's visit to Mary Manning Walsh Nursing Home and communications with Mary Manning staff, Ruotolo learned, or should have learned, that his ward Judith was not being given medically necessary medications, and that his ward Judith was not permitted to walk to the bathroom with assistance but was forced against her will to lie in her own stool. Dr. Adam Brook sent above-identified 3 emails to Ruotolo raising specific concerns about the deficient treatment of his mother by Mary Manning staff and had demanded that Ruotolo have Judith evaluated by a physician. Ruotolo made no efforts to address these problems, and in failing to address these problems Ruotolo breached his fiduciary duty to Judith. Ruotolo's failure to address these problems was a proximate cause of the adverse medical events which lead to her death.

110.    Mary Manning Walsh Nursing Home medical records page 23, entry from Resident Care Manager Doris Bermudez on January 20, 2020, 11:21 AM reported Judith's valiant efforts to advocate for her own care:

"Resident received in bed awake with aide at the bedside. She is noted with disruptive behavior, she is verbally abusive and is using foul language with personal aide and the unit staff, and is refusing care including vital signs. She states 'I want to go home' and 'get me out of here!'"

111.    But Ruotolo and the Mary Manning staff ignored these requests, failed to provide proper medical treatment, and forced Judith to remain in the Mary Manning Walsh Nursing Home against her will.

112.    Ruotolo's timesheet has an entry for January 20, 2020, "Telephone call to H. Muser re IP's stay at nursing home." Upon information and belief, Muser requested that Ruotolo allow Judith to return home as Ruotolo reported of his January 19, 2020-telephone call with Muser, but Ruotolo refused.

113.    Mary Manning Walsh Nursing Home medical records pages 8 through 12 document that between January 18, 2020, and January 21, 2020, all of Judith's medications were not administered except for acetaminophen, which is the generic name for plain Tylenol.

114.    Ruotolo and Mary Manning healthcare providers responsible for the well-being and care of Judith, and Mary Manning healthcare providers responsible for administering medications to Judith, were negligent in failing to adequately care for Judith and failing to administer necessary and proper medications to Judith. Ruotolo was made aware of these omissions and was negligent and breached his fiduciary duty to Judith in not having these deficiencies in care immediately corrected.

115.     One of the medications that Judith had been prescribed but which
was not administered was midodrine. Judith's physicians had prescribed
midodrine. Midodrine would have raised Judith's blood pressure. The
failure to administer midodrine contributed to Judith becoming
unconscious on January 21, 2021.

116.     Mary Manning medical records pages 8–10 document that the
medications spironolactone and bumetanide were not administered to
Judith. Judith's physicians had prescribed spironolactone and bumetanide
in order to prevent heart failure. The failure to administer spironolactone
and bumetanide contributed to Judith developing heart failure.

117.     Judith's gastroenterologist Dr. SriHari Mahadev had prescribed for
Judith the medication pantoprazole in order to prevent gastrointestinal
bleeding. According to the medication administration record on pages 8–
12 of Mary Manning medical records, Mary Manning healthcare providers
failed to administer pantoprazole to Judith.

118.     On January 20, 2020, 8:08 PM, Dr. Adam Brook emailed Ruotolo:

I am writing to inform you that my mother is lying in her feces in
the Mary Manning Walsh nursing home in which you have placed
her. The nursing staff at Mary Manning Walsh refuse to allow my
mother to walk to the bathroom. They also have not provided her
with a walker. In addition, the home health aide assigned to be
with my mother has told me that she has been placed on
"companion duty", meaning that she cannot change my mother's
diaper. This means that my mother has to wait for one of the Mary
Manning Walsh floor aides to be available before her diaper can

be changed. The floor aides at Mary Manning Walsh have not been attentive, and my mother has waited hours to have her diaper changed. As a result of this, my mother developed inflammation of the perineum. This creates a significant risk of infection of the perineum and perineal gangrene. In addition, lying in her feces places my mother at risk of urinary tract infection. I cannot understand why my mother is being placed at such risk when my mother has requested to walk to the bathroom. It defies common sense. Thank you in advance for your anticipated attention to this very serious matter that needs to be addressed promptly.

119.    Ruotolo's timesheet has a January 20, 2020-entry, "Rcd [Received] email from A. Brook regarding IP's [incapacitated person's] care at Mary Manning Walsh", indicating that Ruotolo received Dr. Adam Brook's email on January 20, 2020, regarding the horrendous conditions Judith was subjected to at Mary Manning. But Ruotolo failed to take any action to address the horrendous conditions Judith was subjected to at Mary Manning Walsh Nursing Home, and, in failing to act, Mr. Ruotolo breached his fiduciary duty to Judith and contributed to her suffering the adverse medical events and premature death.

120.    Mary Manning medical records page 240 contains a January 20, 2020, 8:10 PM entry by Eric Nowakowski, R.P.A.-C. which says:

Received call from nurse. Patient having dark/tarry stool. Reports that she is on iron supplement and has had dark stool before. Will order stool guiac [*sic*] testing.

121.    As an initial matter, the Mary Manning Medication Administration Record on pages 8–10 of the medical records indicates that while iron had been prescribed for Judith, it was not given to her.

122.    This is a reason why taking iron tablets is a highly improbable cause for the dark, tarry stools that the nurse reported on January 20, 2020, 8:10 PM.

123.    But more importantly, while iron may cause dark stools, it does not cause dark, tarry stools.

124.    The one and only cause of dark, tarry stools is gastrointestinal bleeding. Dark, tarry stools are called "melena".

125.    Evidence of gastrointestinal bleeding, particularly in an elderly patient with a history of hereditary hemorrhagic telangiectasia and gastrointestinal bleeding, should have prompted immediate transfer to a hospital for evaluation as the standard of care.

126.    But Mary Manning healthcare providers and Monitor/Me physician assistant Nowakowski committed medical malpractice by observing these symptoms and findings and failing to immediately take Judith to a hospital for evaluation.

127.    On January 21, 2020, at approximately 8:55 AM, while still at Mary Manning Walsh Nursing Home, Judith became unresponsive and lost consciousness. CPR was administered by Mary Manning staff, and she was rushed by ambulance to the Emergency Room of NYP Hospital.

128.    To a reasonable degree of medical certainty, Judith became unresponsive as a result of: 1. The succession of defendants' negligent

31

treatment including Mary Manning and Monitor/Me healthcare providers observing that Judith was having melena, but not transferring her to a hospital, and failing to administer medications including cardiac medications and pantoprazole; 2. Mary Manning healthcare providers not communicating with Dr. Adam Brook, which prevented Dr. Brook from timely identifying defendants' negligent care and treatment and initiating standard of care treatments to prevent the devastating consequences proximately caused by defendants' medical malpractice and Ruotolo's breach of fiduciary duty.

129.    Mary Manning medical records page 243 has the entry by Mary Manning physician Dr. Florence Pua on January 21, 2020, at 9:26 AM. This entry is 13 hours after the January 20, 2020, 8:10 PM entry describing dark, tarry stools. Dr. Pua's January 21, 2020, 9:26 AM entry says:

> Chief complaint
> CC [Chief Complaint]: for f/u [follow up] of sudden seizure, LOC [loss of consciousness] suddenly while speaking with the nurse and developed cardiac arrest.
> HPI [History of Present Illness]: Resuscitation was done, a pulse was regained, 911 came. Her guardian, Joseph Ruotolo was notified.

130.    By reason of the foregoing, defendants Mary Manning Walsh Nursing Home and its employees and contractors; and Monitor/Me, L.L.C. and its employees and contractors, including Eric Nowakowski, R.P.A.-C and Jason Kubert, M.D., committed medical malpractice. As hereinabove

alleged, each of these malpractice defendants had a professional relationship and obligation to Judith, failed as alleged herein to act with the proper standard of medical care, and proximately caused injury and damage to Judith as hereinabove alleged, in an amount to be determined at trial.

131.    Ruotolo's timesheet has an entry for January 21, 2020, "Telephone call from Mary Manning Walsh re IP [incapacitated person] in cardiac arrest." (Ruotolo's June 17, 2020-Order to Show Cause to Settle a Final Accounting)

132.    The next entry on Ruotolo's timesheet for January 21, 2020, "Telephone call from Mary Manning Walsh re IP having a pulse & 9-1-1 called. Notified L. Rubenstone."

133.    On January 21, 2020, New York Presbyterian Hospital staff resuscitated Judith and determined that the cause of her episode of unconsciousness was hypotension due to gastrointestinal bleeding.

134.    NYP staff determined that Judith had sustained a rib fracture as a result of the CPR she underwent at Mary Manning Walsh Nursing Home.

135.    The rib fracture led to pneumonia and Judith's death less than 2 months later.

136.    Thus, Ruotolo and the defendants failed to ensure that Ruotolo's ward Judith received proper treatment and medical care and proximately caused her pain, suffering, and premature death.

**Ruotolo conspires with Mary Manning Walsh Nursing Home to prevent Dr. Adam Brook from obtaining his mother's medical records**

137.    Ruotolo's May 26, 2020 "Affirmation of Extraordinary Services" contains a timesheet with a January 23, 2020-entry, "at Mary Manning to deliver Court's 1/6/20 order re IP's medical records."

138.    Upon information and belief, Ruotolo went to the Mary Manning Walsh Nursing Home, on January 23, 2020, and delivered the January 3, 2020-Order to the medical records department of the Mary Manning Walsh Nursing Home in order to prevent Dr. Adam Brook from obtaining Judith's medical records, which Dr. Adam Brook was attempting to obtain in order to understand the reason why Judith became unconscious at Mary Manning on January 21, 2020. Notwithstanding the Guardianship Court's orders that Dr. Adam Brook be permitted to participate in his mother's medical care, Mary Manning Walsh Nursing Home staff wrongfully failed to comply with those Orders and their duty to provide Dr. Adam Brook with his own mother's medical records.

**Ruotolo conspires with Mary Manning Walsh Nursing Home to transfer Judith back to Mary Manning Walsh Nursing Home**

139.    After the events of January 17–21, 2020, at New York Presbyterian Hospital, under the care of geriatrician Dr. Eugenia Siegler, Judith made a gradual recovery.

140.    On February 5, 2020, despite the disastrous events of her prior four day stay from January 17–21 at Mary Manning, even though Judith

34

was having dyspnea and was not ready for discharge from NYP, and without discussing the matter with his ward Judith, Ruotolo and Mary Manning employees directed that Judith be returned to Mary Manning Walsh Nursing Home. This direction was contraindicated and medically unsafe.

141.        Ruotolo and Mary Manning Walsh Nursing Home staff failed to discuss their February 5, 2020-plan to return Judith to the Mary Manning Walsh Nursing Home with either Judith or Dr. Adam Brook. In doing so, Ruotolo and Mary Manning Walsh Nursing Home staff failed to consider Judith's wishes, preferences and desires and the necessary and proper level of medical care. In moving Judith back to the Mary Manning Walsh Nursing Home without Judith's consent, Ruotolo and Mary Manning Walsh Nursing Home staff again violated NYMHL §81.22(a)(9), which provides:

> [P]lacement of the incapacitated person in a nursing home … shall not be authorized without the consent of the incapacitated person so long as it is reasonable under the circumstances to maintain the incapacitated person in the community, preferably in the home of the incapacitated person.

142.        The Fourth Amendment also prevents forcing a citizen into a facility without due process.

143.        Ruotolo moved Judith back to the Mary Manning Walsh Nursing Home without Judith's consent even though the Guardianship Court's January 3, 2020-Order did not grant Ruotolo or Mary Manning Walsh

Nursing Home authority to move Judith back to a nursing home without Judith's consent.

144.    Immediately prior to her transfer back to Mary Manning Walsh Nursing Home, Dr. Adam Brook discussed with his mother Judith her transfer back to Mary Manning and made a recording on his iPhone. A transcription of the February 5, 2020-recording is as follows:

> DR. ADAM BROOK: Mom, I've just heard that Mr. Ruotolo wants to send you back to the nursing home, what do you think about that?
> DR. JUDITH BROOK: I think that's terrible. I don't want to go back to the nursing home. And I don't want to see Mr. Ruotolo ever again.
> DR. ADAM BROOK: OK.

145.    Paramedics physically removed Judith from NYP and took Judith to the Mary Manning Walsh Nursing Home against her will. However, on arrival at Mary Manning Walsh Nursing Home, the paramedics were so concerned about Judith's condition, including the dyspnea that she was experiencing, that they insisted that a Mary Manning physician see her before they left. The paramedics waited an hour with Judith until the Mary Manning physician evaluated her.

146.    A Mary Manning physician came and evaluated Judith. The physician determined that Judith needed to return to NYP.

147.    Judith was then brought back to the NYP Emergency Department and then was readmitted to NYP.

36

**Judith becomes unresponsive at NYP**

148.      On February 15, 2020, at approximately 7 AM, Judith became

unresponsive at NYP.

149.      Judith entered a coma on February 15, 2020.

**Judith dies on March 15, 2020**

150.      Judith never recovered from the coma. She died on March 15,

2020, while at NYP.

<u>first cause of action</u>

**(42 U.S.C. §1983—Civil Action for deprivation of rights)**

151.      Plaintiffs repeat and re-allege the allegations stated above as if

fully set forth herein.

152.      Ruotolo and Mary Manning Walsh Nursing Home deprived Judith

of her Constitutional rights under the Fourteenth, Fifth, and Fourth

Amendments by dumping Judith in Mary Manning Walsh Nursing Home

against her will, without a statutorily required court order, *see* NYMHL

§81.22(a)(9), and refused to allow her to return home as she expressly

requested.

153.      The conduct complained of was committed by these co-

conspirators acting under color of state law, since these individuals were

conspiring with each other to reach a pre-ordained common goal of

keeping Judith in the nursing-home for its and Ruotolo's financial benefit,

in conspiracy with the state actors and under state laws
unconstitutionally applied, in violation of 42 U.S.C. §1983.

154.     As a direct and proximate result of the aforesaid wrongful acts of
Mary Manning Walsh Nursing Home and its employees and contractors,
Judith and Judith's estate have in the past suffered, and will in the future
continue to suffer, substantial damages in an amount to be determined at
trial.

### second cause of action

**(42 U.S.C. §1988—Proceeding in vindication of civil rights)**

155.     Plaintiffs repeat and re-allege the allegations stated above as if
fully set forth herein.

156.     Defendant Mary Manning Walsh Nursing Home conspired with
Ruotolo to wrongfully strip Judith of all her civil rights.

157.     Mary Manning Walsh Nursing Home, acting under color of state
law in conspiracy with state actor Ruotolo, wrongfully deprived Judith of
her civil rights in violation of 42 U.S.C. §1988.

158.     As a direct and proximate result of Mary Manning's wrongful acts,
Judith, Judith's estate, and Dr. Adam Brook have in the past suffered, and
will in the future continue to suffer, substantial damages in an amount to
be determined at trial. The award of damages should include payments of
attorneys' fees.

### third cause of action

**(Constitutional tort for violation of rights provided by the New York State Constitution)**

159.    Plaintiffs repeat and re-allege the allegations stated above as if fully set forth herein.

160.    Mary Manning Walsh Nursing Home and its employees and contractors conspired with state actor Ruotolo to deprive Judith of her rights under the New York State Constitution.

161.    Article I §6 of the New York State Constitution says: "No person shall be deprived of life, liberty or property without due process of law."

162.    Article I §12 says: "The right of the people to be secure in their persons …shall not be violated[.]"

163.    By forcing Judith into Mary Manning against her will and by forcing Judith to remain in Mary Manning against her will, Mary Manning and Ruotolo in conspiracy violated Judith's rights provided by the New York State Constitution Article I. Accordingly, said defendants are liable for these violations of Judith's rights.

164.    As a direct and proximate result of such violations of Judith's rights by Mary Manning and Ruotolo, Judith suffered tremendously for which substantial damages as compensation should be paid by defendants in an amount to be determined at trial.

**<u>fourth cause of action</u>**

**(Wrongful death)**

165.     Plaintiffs repeat and re-allege the allegations stated above as if
fully set forth herein.

166.     Defendants including Mary Manning Walsh Nursing Home,
Monitor/Me, L.L.C., Anthony Bacchi, M.D., Jason Kubert, M.D., and Eric
Nowakowski, P.A.-C. caused Judith Brook's death through their acts of
negligence, recklessness, and intentional misconduct.

167.     Judith's surviving distributees and next of kin include Judith's son
Adam Brook and Judith's teenaged granddaughters Juliette Brook and
Cassandra Brook.

168.     Judith's death gave rise to a cause of action that could have been
maintained at the moment of death by Judith if death had not ensued.

169.     Distributees including Dr. Adam Brook, Juliette Brook, and
Cassandra Brook suffered pecuniary loss by reason of Judith's premature
death, including loss of support, medical expenses incident to death, and
funeral expenses, as well as loss of inheritance, including not only legal
and accounting fees, but also loss of monetary value of the accounts for
which they were named beneficiaries by loss of continued growth of
Judith's assets in what had been tax-sheltered accounts before the
actions of said defendants, and the expense of payment of New York
State estate tax that Judith's estate would not have had to pay had Judith
lived because of her known plan to move to Florida.

170.     Adam Brook has been duly appointed a personal representative of
Judith's estate.

171.    As a direct and proximate result of the aforesaid defendants'
wrongful acts and omissions causing Judith's wrongful death, Judith,
Judith's estate, and Adam Brook have in the past suffered, and will in the
future continue to suffer, substantial damages in an amount to be
determined at trial.

### fifth cause of action

**(Survivorship)**

172.    Plaintiffs repeat and re-allege the allegations stated above as if
fully set forth herein.

173.    Defendants including Mary Manning Walsh Nursing Home,
Monitor/Me, L.L.C., Anthony Bacchi, M.D., Jason Kubert, M.D., and Eric
Nowakowski, P.A.-C. caused Judith Brook's death through their acts of
negligence, recklessness, intentional acts, omissions, and misconduct.

174.    Judith suffered pain and suffering proximately caused by said
defendants' negligent, reckless, and intentional acts of misconduct.

175.    As a direct and proximate result of defendants' wrongful acts,
Judith, Judith's estate, and Adam Brook have in the past suffered, and will
in the future continue to suffer, substantial damages in an amount to be
determined at trial.

### sixth cause of action

**(Breach of fiduciary duty)**

176.     Plaintiffs repeat and re-allege the allegations stated above as if fully set forth herein.

177.     Defendants including Mary Manning Walsh Nursing Home, Monitor/Me, L.L.C., Anthony Bacchi, M.D., Jason Kubert, M.D., and Eric Nowakowski, P.A.-C. breached their fiduciary duty to Judith Brook.

178.     As a nursing home and healthcare providers, Mary Manning, Dr. Bacchi, Dr. Kubert, and Nowakowski were in a fiduciary relationship with Judith and owed Judith a duty of care.

179.     In the case of Mary Manning Walsh Nursing Home, this duty of care included providing Judith adequate and appropriate medical care, providing for Judith's right for independent personal decisions, Judith's right to receive courteous, fair, and respectful care and treatment, and Judith's right to be free from mental and physical abuse. Mary Manning breached this duty of care by failing to provide medical care consistent with generally accepted practice, by failing to transfer Judith to a hospital when medically indicated, for example when she developed melena, by failing to administer Judith's medications to her, by not allowing Judith to walk to the bathroom with assistance but instead forcing her to lie in her own stool 24 hours a day, and by refusing to communicate with Judith's son Dr. Adam Brook regarding Judith's medical condition and medical care, but for which Dr. Adam Brook would have seen to his mother's proper medical treatment.

180.     By reason of Mary Manning's breaches of its duties to Judith, Mary Manning directly damaged Judith, causing her physical harm,

mental anguish, deprivation of her civil and Constitutional rights, and ultimately her premature death.

181.    Monitor/Me, Dr. Bacchi, Dr. Kubert, and Nowakowski had fiduciary duties to provide medical care consistent with generally accepted practice. Monitor/Me, Dr. Bacchi, Dr. Kubert, and Nowakowski breached this duty by failing to direct that Judith be transferred to a hospital when Nowakowski was notified that Judith was having melena and by failing to conduct a proper medical history and physical examination of Judith, including review of Judith's medical records, when Nowakowski was informed Judith was having melena.

182.    By reason of Monitor/Me's, Dr. Bacchi's, Dr. Kubert's, and Nowakowski's breaches of their respective duties to Judith, defendants directly damaged Judith, causing her physical harm, mental anguish, and ultimately her premature death.

183.    As a direct and proximate result of defendants' breaches of fiduciary duty, Judith and Judith's estate have in the past suffered, and will in the future continue to suffer, substantial damages in an amount to be determined at trial.

<u>**seventh cause of action**</u>

**(Medical malpractice)**

184.    Plaintiffs repeat and re-allege the allegations stated above as if fully set forth herein.

185.    Defendants Mary Manning Walsh Nursing Home, Monitor/Me, L.L.C., Dr. Anthony Bacchi, Dr. Jason Kubert, and Eric Nowakowski, P.A.-C. did not use reasonable care and deviated from the applicable standard of care and were careless and negligent in their aforesaid treatment and medical care provided to Judith Brook.

186.    As a direct and proximate result of the aforesaid defendants' wrongful acts and negligence, Judith, Judith's Estate, and Dr. Adam Brook have in the past suffered, and will in the future continue to suffer, substantial damages in an amount to be determined at trial.

### eighth cause of action

**(Intentional infliction of mental distress)**

187.    Plaintiffs repeat and re-allege the allegations stated above as if fully set forth herein.

188.    Defendant Mary Manning Walsh Nursing Home in its conduct and actions directed at Judith Brook, as hereinabove alleged, committed acts which were repugnant and shocking, done intentionally, or with disregard for the very high risk of causing debilitating mental and emotional distress.

189.    The aforesaid acts by Mary Manning did in fact cause Judith to suffer actual debilitating and harmful emotional distress.

190.    As a direct and proximate result of Mary Manning's wrongful acts, Judith and Judith's estate have in the past suffered, and will in the future

44

continue to suffer, substantial damages in an amount to be determined at trial.

**ninth cause of action**

**(Negligence)**

191.    Plaintiffs repeat and re-allege the allegations stated above as if fully set forth herein.

192.    As a nursing home and healthcare providers, Mary Manning Walsh Nursing Home, Dr. Bacchi, Dr. Kubert, and Nowakowski owed Judith a duty of care.

193.    In the case of Mary Manning, this duty of care included providing Judith adequate and appropriate medical care, providing for Judith's right for independent personal decisions, Judith's right to receive courteous, fair, and respectful care and treatment, and Judith's right to be free from mental and physical abuse. Mary Manning breached this duty of care by failing to provide medical care consistent with generally accepted practice, by failing to transfer Judith to a hospital when she developed melena, by failing to administer Judith's medications to her, by not allowing Judith to walk to the bathroom with assistance but instead forcing her to lie in her own stool 24 hours a day, and by refusing to communicate with Judith's son Dr. Adam Brook regarding Judith's medical condition and medical care.

194.    By reason of Mary Manning's breaches of its duties to Judith, Mary Manning directly damaged Judith, causing her physical harm,

mental anguish, deprivation of her civil and Constitutional rights, and ultimately her premature death.

195.     In the case of Monitor/Me, Dr. Bacchi, Dr. Kubert, and Nowakowski, this duty included the duty to provide medical care consistent with generally accepted practice. Monitor/Me, Dr. Bacchi, Dr. Kubert, and Nowakowski breached this duty by failing to direct that Judith be transferred to a hospital when Nowakowski was notified that Judith was having melena and by failing to conduct a history and physical examination of Judith, including review of Judith's medical records, when Nowakowski was informed Judith was having melena.

196.     By reason of Monitor/Me's, Dr. Bacchi's, Dr. Kubert's, and Nowakowski's breaches of their respective duties to Judith, defendants directly damaged Judith, causing her physical harm, mental anguish, and ultimately her premature death.

197.     As a direct and proximate result of defendants' negligence, Judith and Judith's estate have in the past suffered, and will in the future continue to suffer, substantial damages in an amount to be determined at trial.

### tenth cause of action

**(Negligent supervision)**

198.     Plaintiffs repeat and re-allege the allegations stated above as if fully set forth herein.

199.     Jason Kubert, M.D., Anthony Bacchi, M.D., Monitor/Me, and Mary

Manning directed and permitted Nowakowski to provide telemedicine

services to patients in the Mary Manning Walsh Nursing Home. This

included directing and permitting Nowakowski, a physician assistant who

is not permitted by law to practice medicine independently, to receive

telephone calls from Mary Manning nurses regarding Mary Manning

patients.

200.     Nowakowski lacked the education, training, and experience to

address acute medical conditions in elderly nursing home patients

without discussion of those medical conditions with a physician, such as

Dr. Kubert.

201.     Dr. Kubert, Dr. Bacchi, Monitor/Me, and Mary Manning left

Nowakowski on his own and without clear instructions to contact a

physician and ask a physician what to do in the event of an acute medical

problem, such as melena.

202.     Under these circumstances, Dr. Kubert, Dr. Bacchi, Monitor/Me,

and Mary Manning should have realized there was an unreasonable risk

of physical harm from leaving Nowakowski on his own to address acute

medical problems and especially so where Nowakowski was working

remotely and was not taking a history from Judith nor conducting a

physical examination of Judith. Dr. Kubert, Dr. Bacchi, Monitor/Me, and

Mary Manning permitting or directing Nowakowski to provide remote

telemedicine services to Mary Manning Walsh Nursing Home patients

created an unacceptable risk of harm to Judith, which proximately caused the damages alleged. That risk that was realized.

203. Monitor/Me, Dr. Kubert, Dr. Bacchi, and Mary Manning Walsh Nursing Home had taken control of the conduct of Nowakowski. Monitor/Me, Dr. Kubert, Dr. Bacchi, and Mary Manning should have realized that allowing Nowakowski to take telemedicine phone calls from Mary Manning nurses, including telephone calls for acute problems, would likely cause physical harm to Mary Manning patients unless Nowakowski's conduct was monitored and controlled. Monitor/Me, Dr. Kubert, Dr. Bacchi, and Mary Manning were under a duty to use reasonable care to take such measures of control as to assure that Nowakowski was not addressing acute medical problems without supervision. This is especially true where, as here, Nowakowski was providing medical care remotely, without taking a history from Judith or conducting a physical examination of Judith. The unreasonable risk that Monitor/Me, L.L.C., Dr. Kubert, Dr. Bacchi, and Mary Manning created by failing to reasonably control and supervise Nowakowski was realized when Nowakowski failed to properly address the melena that Judith was having, leading to her grave pain, suffering, and premature death.

204. Mary Manning had taken control of the physicians, physician assistants, and nurses who were employees, contractors of Mary Manning, and employees and contractors of Mary Manning's contractors. Mary Manning failed to adequately supervise and control the physicians, physician assistants, and nurses who were providing care to Judith at

Mary Manning. Such inadequate supervision and control resulted in the failure to administer Judith any of her medications, forcing Judith to lie in her own stool 24 hours a day, unlawfully admitting Judith against her will and forcing Judith to remain in Mary Manning against her will, and not transferring Judith to a hospital when Judith developed melena.

205.     The failure by Mary Manning to use reasonable care to take such measures of control over the physicians, physician assistants, and nurses who were employees and contractors of Mary Manning as was needed to provide care consistent with good and safe practice resulted in physical harm to Judith.

206.     As a direct and proximate result of defendants' negligent supervision, Judith and Judith's estate have in the past suffered, and will in the future continue to suffer, substantial damages in an amount to be determined at trial.

## eleventh cause of action

### (Negligent selection)

207.     Plaintiffs repeat and re-allege the allegations stated above as if fully set forth herein.

208.     Mary Manning Walsh Nursing Home failed to exercise reasonable care in selecting Monitor/Me, L.L.C. and Nowakowski to provide telemedicine services to Mary Manning patients. Mary Manning also had constructive or actual knowledge of Monitor/Me's and Nowakowski's

insufficiency to provide the services for which Mary Manning selected
Monitor/Me and Nowakowski.

209.    Mary Manning should have inquired into the nature of the
telemedicine coverage that Monitor/Me would be providing. Mary
Manning should have known that having a physician assistant acting
remotely with little supervision to provide medical care to elderly patients
recently discharged from a hospital, as Judith was, creates an
unreasonable risk of physical harm to the patient. That is exactly what
occurred in this case.

210.    Monitor/Me failed to exercise reasonable care in the selection of
Nowakowski. Monitor/Me failed to exercise reasonable care by selecting
a physician assistant without adequate supervision for the role
Monitor/Me assigned to Nowakowski, namely providing remote medical
coverage to elderly patients recently discharged from a hospital, as Judith
was. Monitor/Me's acted unreasonably by having a physician assistant
acting remotely address acute medical problems in elderly patients,
without adequate supervision by a physician. Monitor/Me also had actual
or constructive knowledge that a physician assistant without adequate
supervision was insufficient for the role Monitor/Me assigned
Nowakowski, namely the provision of remote medical services for acute
medical problems to Judith, an elderly patient who was recently
discharged from a hospital.

211.    As a direct and proximate result of Mary Manning's negligent
selection of Monitor/Me and Nowakowski, and as direct and proximate

50

result of Monitor/Me's selection of Nowakowski, Judith and Judith's

estate have in the past suffered, and will in the future continue to suffer,

substantial damages in an amount to be determined at trial.

**twelfth cause of action**

**(Negligent retention)**

212.       Plaintiffs repeat and re-allege the allegations stated above as if

fully set forth herein.

213.       Mary Manning Walsh Nursing Home and Monitor/Me, L.L.C.

placed Nowakowski in a position to cause foreseeable harm by retaining a

physician assistant with limited or no supervision to address acute

medical problems in elderly patients remotely.

214.       If Mary Manning did not know at the time that Mary Manning

selected Monitor/Me that Monitor/Me would be assigning a physician

assistant with limited or no supervision to provide telemedicine coverage

for elderly patients with acute medical problems, then Mary Manning

was negligent in retaining Monitor/Me and such a physician assistant.

Nowakowski's negligent acts without supervision by an appropriately

trained physician, proximately caused Judith pain, suffering and death. An

appropriately trained physician would have known that melena needs to

be evaluated in a hospital, especially in an elderly patient with a history of

gastrointestinal bleeding. An appropriately trained physician would have

reviewed Judith's medical records and understood the seriousness of the

acute problem of melena in Judith. In addition, if a physician did not

direct the immediate transfer of Judith to a hospital, at a minimum a physician providing medical care consistent with generally accepted medical practice would have examined Judith personally. Seeing and examining the patient in person was not contemplated by Nowakowski, Monitor/Me, and Mary Manning Walsh Nursing Home.

215.    Mary Manning and Monitor/Me, L.L.C. knew or should have known that a physician assistant with inadequate supervision, working remotely without seeing or examining the patient, would be likely to cause an elderly patient harm by failing to provide medical care that meets generally accepted standards when the elderly patient develops an acute medical problem such as melena.

216.    To the extent that Mary Manning did not know at the time that Mary Manning selected Monitor/Me that Monitor/Me would be using a physician assistant with inadequate supervision to provide remote patient coverage and telemedicine services for Mary Manning's elderly patients with acute medical problems, in the course of Mary Manning's retention of Monitor/Me, L.L.C., Mary Manning should have learned that Monitor/Me was using a physician assistant with inadequate supervision to provide remote patient coverage and telemedicine services for Mary Manning's elderly patients with acute medical problems.

217.    As a direct and proximate result of Mary Manning's negligent retention of Monitor/Me and Nowakowski, and as direct and proximate result of Monitor/Me's retention of Nowakowski, Judith and Judith's

estate have in the past suffered, and will in the future continue to suffer, substantial damages in an amount to be determined at trial.

### thirteenth cause of action
#### (*Respondeat superior*)

218.    Plaintiffs repeat and re-allege the allegations stated above as if fully set forth herein.

219.    Mary Manning Walsh Nursing Home employed Monitor/Me, L.L.C. to provide medical coverage and telemedicine services, including responding to telephone calls from Mary Manning nurses regarding patients in Mary Manning Walsh Nursing Home. Monitor/Me in turn employed Nowakowski and Dr. Kubert. Dr. Kubert was supervising Nowakowski.

220.    When Nowakowski responded to the telephone call from a Mary Manning nurse that Judith was having dark, tarry stool, Nowakowski was acting within the scope of his employment and providing the services for which Mary Manning employed Monitor/Me and for which Monitor/Me employed Nowakowski. Dr. Kubert was acting within the scope of his employment by supervising Nowakowski, and therefore was also providing the services for which Mary Manning employed Monitor/Me and Monitor/Me employed Nowakowski and Dr. Kubert.

221.    Under the theory of *respondeat superior* liability, Mary Manning Walsh Nursing Home and Monitor/Me, L.L.C. are vicariously liable for the acts and omissions that Nowakowski and Dr. Kubert committed in the

scope of their employment by Monitor/Me and in the scope of
Monitor/Me's employment by Mary Manning. Such acts and omissions by
Nowakowski, and by Dr. Kubert in his role as supervisor of Nowakowski,
include failure to direct that Judith be emergently transferred to a
hospital; failure by Nowakowski to notify his supervisor Dr. Jason Kubert
that Judith was having melena; failure to adequately review Judith's
medical records, which indicated that Judith had a history of
gastrointestinal bleeding, and which also indicated that Judith had been
prescribed pantoprazole to prevent gastrointestinal bleeding but which
Mary Manning nursing staff were not administering; and failure to come
into the nursing home to personally examine Judith.

222.     As *alter ego* of Monitor/Me, L.L.C., Dr. Anthony Bacchi bears the
same vicarious liability that Monitor/Me, L.L.C. does.

223.     Accordingly, Mary Manning Walsh Nursing Home, Inc.,
Monitor/Me, L.L.C., and Dr. Anthony Bacchi bear vicariously liability for
the harm plaintiffs have suffered, and will in the future continue to suffer,
and should be compensated for their injury substantial damages in an
amount to be determined at trial.

### prayer for relief

**wherefore**, plaintiffs respectfully request that this Court:

1.  Adjudge that defendant The Mary Manning Walsh Nursing Home, Inc.
    and conspirators violated §1983 and conspired as hereinabove alleged

to violate Dr. Judith Brook's Constitutional rights as hereinabove alleged.

2. Adjudge that defendants Monitor/Me, L.L.C, Mary Manning Walsh Nursing Home, Jason Kubert, M.D., Eric Nowakowski, P.A.-C., and Anthony Bacchi, M.D. are liable for wrongful death, medical malpractice, breach of fiduciary duty, and negligence.

3. Adjudge that defendants Monitor/Me, L.L.C., Mary Manning Walsh Nursing Home, Jason Kubert, M.D., and Anthony Bacchi, M.D. are liable for negligent supervision.

4. Adjudge that defendants Monitor/Me, L.L.C., Mary Manning Walsh Nursing Home, and Anthony Bacchi, M.D. are liable for negligent selection and negligent supervision.

5. Adjudge that defendants Monitor/Me, L.L.C., Mary Manning Walsh Nursing Home, and Anthony Bacchi, M.D. are vicariously liable for the acts and omissions of Eric Nowakowski, P.A.-C. and Jason Kubert, M.D.

6. Award judgment in favor of plaintiffs and against each defendant for monetary damages in an amount to be determined at trial.

7. Award plaintiffs costs and attorneys' fees incurred in this action to the extent allowed by law.

8. Grant such other relief as the Court may deem just and proper.

### **jury demand**

Plaintiffs hereby demand a trial by jury on all causes of action herein which are triable by a jury.

Dated: February 15, 2023

/s/

_____

Adam Brook, M.D., Ph.D.

813 Delmar Way Apt. 306

Delray Beach, FL  33483

(415) 516-0787

brook1231@gmail.com

Plaintiff *pro se*

/s/

_____

Daniel W. Isaacs, Esq.

122 Cross River Rd.

Mount Kisco, NY  10549

(646) 438-2100

Daniel.isaacs@danwisaacsesq.com

Attorney for Estate of Judith Brook